E. E. BROSSARD, Trustee, Appellee, v. CHICAGO, MILWAUKEE & ST. PAUL RY. CO., Appellant.

**Railways:** NEGLIGENCE: VERDICT: WHEN CONCLUSIVE. Where there is
1 a real controversy in the evidence in a personal injury action concerning the facts upon which negligence is predicated, such that reasonable minds may differ, the issue is for the jury, and its finding is conclusive on appeal.

**Same:** ENGINE SIGNALS: NEGATIVE EVIDENCE: PROBATIVE FORCE. The
2 evidence of one in a position to see and hear, that there was no light upon a moving car and that neither the bell or the whistle of the engine moving the car was sounded, has probative force, although there was positive evidence to the contrary; and especially where the witness also testified that he knew a train passing him in that location would be liable to injure him, and that he looked and listened for an approaching train. Evidence held to require submission of the issue concerning a light on the car and the giving of the engine signals.

**Same:** NEGLIGENCE: BURDEN OF PROOF: CONTRIBUTORY NEGLIGENCE:
EVIDENCE. Plaintiff was injured by a moving car while upon a street largely occupied by railway tracks, but also used as a thoroughfare for pedestrians, and when he had left the sidewalk because of an obstruction and was walking between the tracks. *Held,* that plaintiff had the burden not only of establishing defendant's negligence, but that such negligence was the proximate cause of his injury and that he was free from contributory negligence; and that the evidence upon the question of contributory negligence was such as to take that issue to the jury.

**Same:** CONTRIBUTORY NEGLIGENCE. It is negligence for one to go upon railway tracks without looking and listening for approaching trains, but the only care required in this respect is that of a reasonably prudent person; and if he looks and listens without seeing or hearing an approaching train within a reasonable distance, and is injured through the negligence of the railway company in failing to give the statutory engine signals the company will be liable.

**Same:** ENGINE SIGNALS. It is not the duty of a railway company to sound the engine whistle within the limits of a city unless that duty is imposed by ordinance.

**Same:** CONTRIBUTORY NEGLIGENCE: INSTRUCTIONS. Where the court told the jury that if plaintiff could have seen or heard the approaching train which injured him in time to have reached a place of safety, in the exercise of ordinary care, he could not recover, refusal to instruct that if he looked and was unable to see whether a train was approaching because of the darkness, his failure to immediately leave the track would defeat recovery was not erroneous; as plaintiff's negligence must be determined, not by a single act, but by all the surrounding facts and circumstances.

**New trial:** MISCONDUCT OF BAILIFF: PREJUDICE. The remarks of a bailiff to the jury, after learning that they were about to report a disagreement, were in substance that it was advisable for them to agree, that the case must be decided by some jury and that they could decide it as well as any jury, did not require the granting of a new trial; where the court subsequently informed them that they could deliberate further, and it did not appear that the remarks of the bailiff had any influence upon their verdict.

**Continuance:** ABSENT WITNESS: DILIGENCE. Where a party failed to show reasonable diligence in procuring the testimony of an absent witness, and to file his motion for a continuance on the ground of such absence of the witness until the second day of the term, though it was apparent before that time that the evidence was desired, re-

fusal of the continuance was not erroneous; especially as the attorney for the opposite party offered in open court to take the testimony by deposition on written interrogatories, and stated that he had in his pocket letters contradicting the statements relied on as a ground for the continuance.

**Evidence:** CONFLICTING STATEMENTS: FACT QUESTION. Where a controversy arose in a personal injury action regarding the time and circumstance under which plaintiff had made certain alleged contradictory statements concerning the injury, and as to what he in fact said, but the only issue thus raised was as to the manner of plaintiff's injury, the question was for the jury.

*Appeal from Cedar Rapids Superior Court.*—HON. C. B. ROBBINS, Judge.

TUESDAY, DECEMBER 15, 1914.

ACTION to recover damages for personal injury. The opinion states the facts.—*Affirmed.*

*Cook, Hughes & Sutherland,* for appellant.

*Barnes & Chamberlain* and *Dawley & Wheeler,* for appellee.

GAYNOR, J.—This is an action to recover damages for personal injury, instituted by the plaintiff herein as the trustee or assignee of one John Yocum.

It is claimed by the plaintiff that his assignor was walking along Fourth street, in the city of Cedar Rapids, and was struck by a mail car belonging to the defendant; that this occurred on the 26th day of March, 1912; that the defendant company had railway tracks laid along Fourth street, and was operating its train thereon at the time of the injury.

The plaintiff makes three charges of negligence against the defendant: (1) In backing its locomotive and car at the time and place, through the darkness, along a public street in a thickly settled and populous portion of the city, with the

car ahead of the engine, and without a light upon the front of the car. (2) In failing to have some person stationed at the front of the car to give warning to pedestrians using the street of the approach of the car. (3) In omitting to give some signal by bell or whistle of the approach of the car and locomotive.

The petition alleges that on the 26th day of March, in the evening, about 8:30, plaintiff's assignor was walking along Fourth street, in said city, between A and B avenues, and was, while so doing, struck down and injured by the carelessness and negligence of the defendant as charged. Defendant's answer is a general denial.

The cause was tried to a jury and a verdict returned for the plaintiff. A motion for a new trial having been overruled and judgment rendered upon the verdict, the defendant appeals.

The evidence discloses that Fourth street, mentioned in the petition, runs north and south, is a public street, and the avenues run east and west, and are numbered 1, 2, 3, etc., southward and A, B, C, etc., northward. Second avenue is about three hundred feet south and Third avenue about six hundred feet south of First avenue. Avenue A is three hundred feet north of First avenue, and the place where it is claimed the injury occurred is about one hundred feet north of A avenue, or four hundred feet north of First avenue. There is a viaduct over the railway tracks running east and west on A avenue. There is a cement sidewalk on the east side of Fourth street. Immediately west of this sidewalk, and adjoining it, is the defendant's track. Next to that is the Rock Island track, and other tracks owned by other companies still farther to the west. There are six or seven tracks in all on Fourth street running north and south, with switch connections between the several tracks.

In approaching the place where plaintiff was injured, it appears that he went straight on Third avenue, across Fourth street, to the east side, crossed the railroad track at Third ave-

nue, then turned straight north on that side of Fourth street, and proceeded on the east side of Fourth street on the sidewalk in a northerly direction to Avenue A, over which is placed the viaduct; that he left the sidewalk between Avenues A and B; that the cement sidewalk ended at the viaduct; that there was a space covered by cinders, on which people walked, under and north of the viaduct before the cement walk was reached. After he left the cement walk, he crossed over on the west side of the Milwaukee track, and walked northerly on the west end of the ties until he reached the point where he was struck, about one hundred feet north of the viaduct over Avenue A.

Upon this point, Yocum testified as follows:

When I came to the end of the sidewalk, I immediately went across the [defendant's] track and in between the tracks. Then I started north. I left the sidewalk between A and B avenues, under the viaduct. The cement sidewalk had ended, and there was mud. I stepped right across the track there. The Milwaukee is the first track to the east side of Fourth street next to the sidewalk. The next track is the Rock Island. When I crossed the defendant's track, I proceeded north, and, with reference to the distance I was from the Rock Island track, I was walking close enough to the Milwaukee track— I was walking possibly on the ends of the ties of the Milwaukee track. . . . I went along that track in a northerly direction, from where I crossed to where I was hit, I should judge about three car lengths.

It appears that the distance between the west rail of the Milwaukee to the east rail of the Rock Island was about ten feet. It appears that the cinder path, from the north end of the walk on the east side to where the cement walk was resumed, is about one hundred and fifty feet, and is continued from that point. Yocum, in explaining why he crossed the defendant's track to the west side after the cement walk had ended, said that there was mud.

It was deep, nearly up to the railroad rails—water and mud. I hadn't got around the mudhole until I received the

injury. I was watching to cross back to the sidewalk so I could go up on the sidewalk.

There are other witnesses who corroborate Yocum as to the condition of this walk on the east side of Fourth street, as to its being muddy and water settling there. One witness says:

I was familiar with the conditions on Fourth street along the side of the Transfer Building, commencing with the north end of the cement sidewalk, and north, during the latter part of March, 1912. I had passed along there some. At times under the viaduct along the Transfer Building was very muddy and west; both mud and water standing there from the thawing snow. There was a very bad mudhole underneath the viaduct and directly opposite the transfer platform, and at times when we had rains it occupied all the space between the Transfer Building and the track, and it would extend north thirty or forty feet.

The Transfer Building referred to by the witness is just north of the viaduct and east of the point where plaintiff was injured.

The plaintiff claims that on this night he took this route to go to the Rock Island roundhouse. It appears that Fourth street was a regularly laid out street, but that it was almost entirely occupied by the railway tracks of the several companies, with switching tracks, and was used at this point, not only for through trains, but also for switching purposes, and almost continually in use by the companies for these purposes; that there is no way of driving teams on Fourth street at this point. The only provision made for travel is a sidewalk on the east side, the one that Yocum was pursuing. It appears that Yocum had been in the employ of the Chicago, Rock Island & Pacific Railway as engineer; that he had been with the Northwestern Railroad Company as locomotive engineer for fourteen years. He testifies that this Fourth street was much used by railroad people in going to and from their work. Upon this point he testified as follows:

That street has considerable use, so far as I have observed, by people walking. Take it about 6 o'clock in the evening, possibly three hundred men of us would all come down in a bunch, and it is used at other times during the night and day. Most every railroad man that goes to the Rock Island round-house has to go that way to get in there, or walk a block out of his way. The Rock Island employs three hundred or four hundred men, that are called, up there to go out on their run, and they use that. It is in constant use the twenty-four hours around when business is good on the Rock Island.

We attach herewith a photograph picture of Fourth street at the point where plaintiff was injured. The place where plaintiff was struck by the defendant's train is marked with a cross on the photograph, and the place on the Rock Island, where his arm was caught and mangled, is shown by a circle. The view on the photograph is taken looking south. This picture shows the tracks and the viaduct that crossed over the tracks at Avenue A.

Yocum testified, in substance: That as he passed north under the viaduct there was a big warehouse on the east side

of the street, and there were three or four cars on the spur track between the sidewalk and the warehouse. There was an engine with ten or eleven cars on the Rock Island track just to his left. That he walked closer to the Milwaukee track because of this train, fearing lest he might be struck by the swinging doors on the train on the Rock Island track. That he walked on the end of the ties of the Milwaukee, picking his way through the mud, and, when there was a good place to step off the ties, he stepped off, and walked between the Rock Island and the Milwaukee tracks. He says that he walked about three car lengths from the point where he crossed over to the point where he was hit. He says that when he first crossed the Milwaukee track, to avoid the mud, he looked west and did not see anything that would prevent him from walking there; that the switchman, at that time, had just given a signal to stop the Rock Island train; that after he crossed the Milwaukee track, and had passed about two car lengths up the track north, he turned and looked again and saw nothing coming on the track; that he walked about three-quarters of a car length, or about fifty feet, after he looked the last time before he was struck. Upon this point he testified as follows:

When I looked the last time, I saw nothing that would indicate that there was anything coming. It was very dark there. I had walked, after I looked the last time, about fifty feet, or possibly a car length, before I was struck. At the time I looked back, I looked along this Milwaukee track. The cars were on the other track—the Rock Island. That is why I was keeping close to the Milwaukee. There was nothing in the way of cars approaching on that track that I could see. I heard nothing. I heard the engine that was pushing the Rock Island string of cars, and the noise of the cars in the water and mud going along there. They made some noise. The Rock Island engine was working steam. They had started to work steam. The train on the Milwaukee, which struck me, was running on the main track. When I say I looked down the Milwaukee track, I mean that I turned and looked back down the track to see if anything was coming. I looked back twice after I crossed the track in going three car lengths.

If there had been a light upon the end of the Milwaukee train that struck me, I could have seen it to First avenue. There was nothing in sight at the time. Nothing that had any lights on to designate it was coming. There was nothing that had any lights on that I saw. It was dark as pitch. I knew that I was in a place of danger. I had railroaded twenty-eight years, and knew it was a dangerous place. I was conscious that I was liable to be struck by trains going either way at any moment.

He further testified that the train that struck him was backing towards the north with the engine facing towards the south; that he saw no lights; that, if there had been, he could have seen it as far as First Avenue, three hundred or four hundred feet.

I had my ears open, and I was looking for anything to come along. I, kept my eyes open, or I wouldn't have looked around twice in three car lengths. I didn't, however, look around the last fifty feet before I was struck. I did not stop and listen, to see if there was a train coming, in the last fifty feet. Did not take long to walk fifty feet. At that time I was possibly a foot or a foot and a half from the rails of the Milwaukee.

It appears that there was usually a light under the viaduct—a large incandescent light. It appears that this was not always lighted. Yocum testified that on this night there was no light under the viaduct. He further testified, in substance: That, when the Rock Island train reversed and started north, he turned and looked down the track; that the Rock Island cars were going by him and making a noise. The smoke, however, did not hide the view of the Milwaukee track. He said he could have seen it if there had been a light upon the Milwaukee car that struck him. He said he was struck in the right side above the hips. He received a violent blow which knocked him off his feet. That it was eight or ten feet from where he was struck to where his arm lit on the rail of the Rock Island track. That his left arm went under the wheels

of the Rock Island train, and the wheels passed over it; that he was knocked flat on his face. He testified further that the side door of the car that struck him was open. He testified that after he was struck he raised his head up and saw a man standing in the side door with a lantern on the side next to the engine. The lantern was hanging in his left hand so that the engineer could see it. He testified that the train that struck him consisted of a coach and an engine, the engine facing to the south but moving towards the north; that the only light he saw was the headlight on the engine, which was facing to the south; that the car had two doors, one on each side; that the end of the coach that struck him was the blind end, with no platform to stand on. He says there was no one on the end of the car or any light on the end of the car that struck him; that there was no bell ringing or whistle blowing.

Defendant's engineer, who had charge of the train that night that struck the plaintiff, testified:

There was no place—no platform on the north end of that mail car to stand. It was what you call a blind end. I know there are men walking up along Fourth street between those tracks from First avenue up north, night and day, and a good many of them. I frequently see them when I go up there.

Such is the record upon which this case was tried, excepting that, as to the negligence charged against the defendant, there is a sharp conflict in the evidence. There is no conflict in the evidence as to the course which the plaintiff pursued that night, or as to the manner in which he conducted himself prior to and at the time he was injured.

The first charge of negligence is that there was no light on the north end of the car that struck Yocum; second, that no warning was given of the approach of the car; third, that no signal by bell or whistle was given as the car approached.

Upon all fact questions, where there is a controversy in the evidence, the question is for the jury, and their finding is

conclusive upon this court.  We do not mean by this that this court will not interfere where there is only an apparent conflict in the evidence but no real conflict when the case is fully and fairly analyzed; but where, upon the record made, reasonable minds might differ as to what the real fact is, upon which the negligence is predicated, then it becomes a question for the jury, and their finding upon the fact is conclusive upon this court.

1. RAILWAYS : negligence : verdict : when conclusive.

It is argued by appellant that a great preponderance of the testimony shows that the defendant on that evening had a light on the north end of the moving train, and that the bell was continuously rung after leaving First avenue up to the point where the plaintiff was injured, and that plaintiff's position of peril was not discovered at any time by those in charge of the train, that the conflict raised by the testimony of the injured party, upon the question of defendant's negligence (the absence of lights and the failure to ring the bell), is of such a character that no reasonable mind could reach any other conclusion than that he is either falsifying, or that he is mistaken, or that he was not in a position to know what the fact is touching these matters.  It is argued that he was walking with his back to the train that struck him; that he had walked fifty feet without looking back; that there was a train moving on the Rock Island track so close to him and making so much noise that it cannot be assumed that there is any probative force in his statement that "he did not hear the bell rung," in determining the substantive fact as to whether it was rung or not; that the probative force of this negative testimony that "he did not hear the bell rung" is destroyed by a showing that he was not in a position to hear the bell rung, even if it were ringing.

2. SAME : engine signals : negative evidence : probative force.

It has frequently been held by this court that this negative testimony has probative force where the party giving it is in a position to know of the fact, if it occurred, and should be considered by the jury, even as against direct testimony, as to the existence or nonexistence of the fact.  The probative

force of such testimony depends upon so many things—upon the character of the witnesses who give it; whether or not they had reason to observe the fact; whether the mind was diverted from a consideration of the fact at the time; whether the party was interested in knowing whether the fact existed or not—that in most cases it becomes largely a question for the jury to decide whether the negative or positive testimony has the greater probative force as to the fact. This question has been frequently discussed by text-writers and passed upon by the courts of this country.

In *Hoffard v. Railway Co.*, 138 Iowa, 549, we find this language used by the court in discussing this question:

Now, as said by Prof. Wigmore in his work on Evidence, section 664, it is altogether possible to negative the existence of a fact, state, or condition, by testimony 'based on what may be called negative knowledge; i. e., testimony that a fact did not occur, founded on the witnesses' failure to hear and see a fact which he would supposedly have heard or seen if it had occurred.' And he adds that 'the only requirement is that the witness should have been so situated that, in the ordinary course of events, he would have heard or seen the fact had it occurred.' And this we conceive to be the correct doctrine. Accordingly it is not enough to give rise to a conflict in the evidence for a witness to say merely, 'I did not hear the whistle sound!' He must go farther and show that he was not only in position to hear or see, but in mental condition to have heard or seen, had the whistle been sounded. In other words, he must have knowledge of the subject derived through the medium of his senses—such knowledge as enables him to speak affirmatively against the existence of the fact. In this view, there is no such substantial conflict in the evidence in this case as to require a submission to the jury of the question whether or not the statutory warning was given for the crossing.

In this *Hoffard* case it appears that the witnesses who gave the negative testimony, who said they did not hear the whistle blown, were more than half a mile away from the train, were engaged in breakfast, were behind closed doors, had no

concern in the train in question, and were giving no attention to it; that, as against such testimony, there are other witnesses who testified positively to the fact of the warning whistle, and these witnesses were charged with a duty in respect to the matter, and in addition there were other witnesses who positively testified that they heard the danger signal.

In the case of *Payne v. Railway Co.*, 108 Iowa, 188, relied upon by appellant, it appeared that the witnesses who testified that they did not hear the signals were not in a position to hear, or were not concerned in knowing whether the whistle was blown or not, were not giving the matter any attention; and it was there held that the negative testimony "that they did not hear the whistle blown" did not create any conflict in the evidence as to the substantive fact, as against the testimony of those who were in a position to hear, charged with the duty, and testified as to the existence of the fact.

In *Mackerall v. Omaha & St. L. Ry.*, 111 Iowa, 549, second division of the opinion, this court said:

'The engineer and fireman declare there were two long and two short blasts of the whistle at the whistling post, and from there to the crossing the bell was rung. The conductor and two passengers claim to have heard the whistle and also three section men, who were working forty rods below the crossing. On the other hand, the plaintiff testified that he heard no signals, and three others in a situation to hear, without their attention being diverted, say they heard neither the bell nor whistle until after the train had passed the crossing, when two blasts were sounded. Such evidence is not negative merely, as where a person, at a considerable distance, and giving attention to something else, declares he did not hear the signal.' In such case 'the issue was for the jury to determine.'

We come now, therefore, to the application of this rule to the case at bar, and the question is: Does the negative testimony of plaintiff, if we may term it such, have probative force on the questions at issue, as against the positive testimony offered by the defendant, to the effect that there was a

man and a light upon the north end of this car that struck the plaintiff, and that the whistle was continuously blown between First avenue and the point where Yocum was struck.

It appears that Yocum was in a place of danger; that he was conscious of that fact; that he knew that, if a train passed along at that point where he was after he crossed the track, he was liable to be injured. He said he knew that a train might come at any moment. He said he was listening for any sound that indicated the approach of a train upon that track. He looked back twice to see whether or not there was any train upon the track. It was very dark. The darker the night is the more readily a light in the distance can be seen. He said if there had been a light upon the north end of that train he could have seen it as far back as First avenue; that he turned around and looked down the Milwaukee track to ascertain what the fact was. He was interested, and his safety depended, upon knowing what the fact was. He said he saw no light that indicated the approach of a train. Saw no light and heard no sound. He turned and walked northward, listening, as he claims, all the time until he was struck, for any sound that might suggest danger. He was therefore in a position both to hear and see. He was in a mental condition, suggested by his position, that put him upon inquiry as to the existence of the fact.

As a reasonably prudent man, he was necessarily interested in knowing whether or not a train was approaching him upon this track. He was in such a position that the least suggestion of danger would not only have prompted him to step . aside, but he could easily have done so. He was in such a position that a knowledge of the approach of the train was an important factor, involving his safety. If he had looked, as he says he did, on this dark night down the Milwaukee track, searching in the darkness to ascertain whether a train was approaching him on this track, he certainly would have seen the light, it it had been there, and the fact that he did look

and did not see it has probative force as to the existence or nonexistence of a light.

This case is clearly distinguishable from that line of cases where one testifies to having looked and listened and failed to discover, and it appears that, if he had looked and listened, he would have discovered.

Upon this point we cite *Selensky v. C. G. W. Ry. Co.*, 120 Iowa, 113, in which it is said:

Counsel for appellant invoke a rule, which has received countenance in some cases in this state and elsewhere, to the effect that, as between positive evidence on the part of witnesses who are in a position to hear that a signal is given, and negative evidence on the part of other witnesses, similarly situated, that they have heard no such signal, there is not a conflict in the evidence; the so-called negative evidence having no weight as against the positive evidence of those who testified that they actually heard the signal. But it appears in this case that the plaintiff was looking out for signals, realizing that the crossing was a dangerous one, knowing that a train was due about that time; that her husband knew that plaintiff would reach the crossing about that time, and was also on the lookout for any indications of an approaching train; that another witness heard the signal of the train about two miles away, and then the danger signal, but did not hear any signal at the whistling post. Under the circumstances, we think that the testimony of witnesses, who were thus in a situation to hear, and likely to have heard, a crossing signal, if one had been given, that they did not hear any such signal cannot be entirely ignored and treated as of no weight because opposed to the testimony of witnesses who say that a signal was actually given, or that they heard such a signal. . . . As between two witnesses listening at the same time for a signal, the testimony of one that no signal was given is just as much affirmative evidence as the testimony of the other that it was given.

Under this record, we think there was sufficient evidence as to the negligence of the defendant to justify the court in submitting that question to the jury for its determination; that there was a substantial conflict in the evidence as to the

fact of negligence charged; and the court did not err in submitting this question to the jury.

However, we must not overlook the fact that the burden of proof rested on the plaintiff, not only to show the negligence charged against the defendant, and that it was the proximate cause of his injuries, but he must also purge himself from any negligence contributing to his injuries. Upon this question, we have to say that Fourth street was a regularly laid out public thoroughfare. It is true that at the time of this accident it was almost exclusively occupied by these railway tracks for legitimate purposes. Their right to occupancy, however, was not exclusive upon this street. There was a sidewalk along the east side of Fourth street which was an invitation to the public to travel there. The plaintiff was traveling there. It appears from the testimony that this was quite a public thoroughfare along this sidewalk. The engineer of this train testified that the travel extended also, not only along this walk, but between the tracks, night and day; that there was a good deal of travel, not only upon this walk, but between the tracks, crossing over or along. The plaintiff's testimony suggests that it was frequently traveled by railroad men passing to and from the Rock Island roundhouse; that on this night his purpose was to go to the Rock Island roundhouse; that he followed the usual line of travel along the east side of the street; that, when he reached the north end of the cement walk on the east side, the travel along there was interrupted by physical conditions that made it necessary for him to pass out of the direct line of the sidewalk onto the portion of the street occupied by defendant company.

3. SAME: negligence: burden of proof: contributory negligence: evidence.

It is not suggested that he was not rightly at this place. It is not claimed that he was a trespasser. It is not claimed that the defendant company owed him no duty at that point. The most that can be claimed, and we think the most that is claimed, is that he did not exercise reasonable care and caution for his own safety while near these tracks. Whether or not

a man, under certain conditions, is exercising reasonable care for his own safety is usually a question for the jury, and court has no grounds for interfering, unless it appears affirmatively. that his negligence was so palpable that, upon the facts shown, reasonable minds cannot differ in the conclusion to be reached. It cannot be claimed that he was negligent in anything that he did up to the last time that he looked back down upon the track. It appears, however, that he walked fifty feet after he last looked before he was struck; that during that time he kept his face toward the north; but it does appear from his testimony that he was listening during all the time for any sound suggesting the approach of a train upon this track. Was he guilty of negligence in not looking back while he traveled these fifty feet? He says that within fifty feet of the place where he was struck he looked down upon this track; that he could see a light at least to First street, three hundred and fifty feet to the south. The night was dark. He saw no light. He saw nothing approaching him upon this track. He was picking his way along. He says that he was passing around this mudhole; that his purpose was to resume the sidewalk as soon as he got to a point where he could do so. He saw the Rock Island train on the track beside him, and could see the brakeman swinging his lamp several blocks away; that he saw no train upon this track nor any light indicating the approach of a train.

The law does not fix any point at which a traveler should look and listen. There was no danger in his position, except from approaching trains. He knew this. The only question is: Did he use the care which a reasonably prudent man would exercise under like circumstances? Was he justified in assuming that, after he had looked down the track and saw no train approaching, no light to indicate the approach of a train, heard no bell rung, it would be safe for him to proceed further near this track and around this mudhole without looking back again?

4. SAME: contributory negligence.

As said in *Lorenz v. B., C. R. & N. Ry. Co.*, 115 Iowa, 377:

While the rule is well settled in this state, and generally elsewhere, that it is contributory negligence for a person to go upon a railway track without looking or listening to ascertain whether there is danger from an approaching train, yet his duty in that respect is to exercise the care which reasonably prudent persons would exercise under such circumstances. The duty to look and listen is not an absolute one, but one the exercise of which is dependent on conditions.

We do not think that this record discloses such a want of care on the part of Yocum as would justify this court in saying, as a matter of law, that he was guilty of contributory negligence in what he did or omitted to do that night. If the finding of the jury on the question of a light on the north end of this train is taken as an affirmation of the fact claimed by the plaintiff that there was no light on the train, then, considering the darkness of the night, further looking would not have availed him anything. At least we think this question was properly left to the jury. See *Winey v. Railway Co.*, 92 Iowa, 622, in which it is held that the instruction that it was the duty of a person to look and listen for approaching trains at all points in his passage, and that he was guilty of contributory negligence if he failed to do so, was stating the rule too broadly, because it usurped the province of the jury, and because it requires a traveler to keep his eyes constantly upon the track for trains at all points leading to its passage, whether the view of the track is obstructed or not.

The rule no doubt is that if the traveler, having looked and listened without seeing or hearing an approaching train within a reasonable distance of the crossing, is, by reason of a neglect of the railroad company to blow the 'statutory' whistle, run down and injured, liability attaches therefor; and if the view of the track is obstructed by any means, so as to render it impossible or difficult to learn of the approach of a train, or there are complicated circumstances calculated to deceive or throw a person off his guard, then whether it is

negligencê on the part of the traveler who fails to look and listen is a question of fact for the jury to determine from the circumstances of each particular case. (See, also, *Schulte v. C., M. & St. P.,* 114 Iowa, 89; *Harper v. Barnard,* 99 Iowa, 159.)

. It is next contended that the court erred in submitting to the jury, as a basis for recovery, the alleged negligence in failing to blow the whistle, and it is claimed, and rightly so,

5. SAME: engine signals.

that there is no such duty primarily upon the company to blow a whistle within the limits of a city, unless made so by an ordinance. There is no proof of any ordinance in this case requiring them to blow a whistle. But we think an examination of the court's instructions will disclose that the court did not submit this as a distinct ground of recovery, and for this reason this allegation of error is not tenable as a basis for reversal.

It is also claimed that the court erred in failing to give an instruction asked by the defendant to the effect that if Yocum had looked down the track, as he says he did, and

6. SAME: contributory negligence: instructions.

was unable to see whether or not a train was approaching because of the darkness, it was his duty immediately to leave the track and get in a place of safety, and, if he failed to do this, he could not recover. We think there was no error in this. See *Mitchell v. Union Terminal Co.,* 122 Iowa, 238.

We think the plaintiff's conduct, whether negligent or otherwise, is to be determined, not by one particular act or fact, but by all the facts and circumstances that attended him in the doing of the act complained of. The court, in its instructions to the jury, we think, gave a rule to guide the jury as favorable to the defendant as, under this record, it was entitled to have submitted, as follows:

Therefore, if you find from the evidence that, because of all the surrounding circumstances, John Yocum could have seen or heard the defendant's train in time to have gotten to a place of safety, had he exercised ordinary care to ascertain

whether or not there was a train coming, then the accident was the result of John Yocum's own contributory negligence, and there can be no recovery herein.

It is next contended that the court erred in refusing to grant a new trial on the ground of misconduct of the bailiff. It appears that some time after the jury had been deliberat-

7. NEW TRIAL: misconduct of bailiff: prejudice.

ing upon their verdict, and while they were deliberating, the bailiff, in charge of the jury, spoke with some of the jurors touching the propriety, necessity, or advisability of their agreeing. It seemed they were unable to agree at this time, and had practically agreed to disagree. The bailiff was examined upon this point and testified as follows:

I was bailiff in this case. There was one time when there had been quite a little time since any of the jurors had come through the room where I was, and I came to the door and opened it and asked them if they had arrived at a verdict, and one of them (I don't know which) said, 'No;' and then they said, 'We are about to bring in a verdict; we agree to disagree;' and I said to them, 'I don't think the judge will accept a verdict of that kind.' Q. Did you have any other talk with them or say anything at different times to them about trying to agree? A. When they passed through where I was, I would say it would be nice to decide it, or it ought to be decided now, and the judge would be glad not to have a disagreement—'to have you decide it.' That would be after they had been out a long time, and it seemed as if they might not agree. I do not know to which one of the jurors I said that. I said to some of the jurors that some jury would have to decide it. I said to them, 'Some jury will have this case to decide;' and I said I thought this jury was just as able to decide it as any jury they could get. I said at one time (I don't know just when it was) that Judge Reed positively objected to a decision of that kind—to a verdict, 'We agree to disagree.' I did not say anything about keeping them out thirty-six hours. I heard it mentioned between them some time when they were passing out or in that they might have to stay thirty-six hours, but I did not say so. This conversation with reference to their agreement to disagree was shortly before

noon Sunday, or just a short time before the judge went into the jury room.

Five of the jurors were called in support of defendant's contention of misconduct on the part of the bailiff. One juror testified:

We had agreed to disagree. We had written it out and signed it, but it was not taken to the bailiff or delivered. He said he had no conversation with the bailiff about the desirability of deciding the case. Whatever he did say had no influence upon me in arriving at the verdict.

Another juror said:

All I heard about what the bailiff said was from the other jurors. Had no conversation with him. What they told me had no influence on my verdict.

Another said:

I passed through the room where the bailiff was. As I returned, he asked me if we had arrived at a verdict. There was something said to the effect that it was too bad that we could not agree; and I said, 'Yes, it was.' That is all he said to me that I heard. In arriving at a verdict, I did not take into account or consideration anything that I heard, except the law and the evidence.

Another juror said:

I did not hear any statements made by the bailiff, except that, as I went through, he asked me if we had arrived at a verdict. I told him, 'No.' He said that it was too bad, or something like that. I said it was. He said that us twelve could decide the case as well as any other, or something like that. I did not take into consideration anything that I heard from the bailiff in making up my verdict.

Another juror said:

I heard some talk among the jurors as to what the bailiff said. I understood that he said we must return a verdict;

that we could not return a disagreement. The matter that we should agree was talked over as having come from the bailiff. That was my understanding, and that we would have to agree upon a verdict. That was all in relation to a conclusion we had reached—to agree to disagree—that we should sign something stating to the court that we had agreed to disagree. I heard that the bailiff said that he did not believe that the court would accept a written statement that we had agreed to disagree. All this talk about what I heard the bailiff said about our agreeing or having to agree was before the court came into the room.

It appears that about 10:30 on the morning of Sunday, December 15, 1912, in the presence of the attorneys for the plaintiff and defendant, the court entered the jury room and asked the jury: "Have you agreed upon a verdict?" to which the jury answered, "No." Whereupon the court asked the jury if they understood the instructions, and the jury indicated that they did. The court asked them if they had any questions to ask regarding the instructions, and, having received no reply, then said: "Very well, I will let you deliberate a while." Thereupon left the courtroom. The jury returned a verdict in this case at 2 or 3 o'clock in the afternoon of the same day on which the court visited the jury room, as above set out.

The defendant relies upon *Cole v. Swan*, 4 G. Greene, 32, and *State v. La Grange*, 99 Iowa, 14. In each of the cases the conduct was more flagrant than that exposed in this record, but in the *La Grange* case the court said:

We are not to be understood, however, as holding that a new trial should have been granted in this case, had it been made to appear that prejudice did not result from the misconduct in question. Technical errors or defects which do not affect the substantial rights of the parties are to be disregarded.

While the conduct of the bailiff is not to be commended, we cannot reverse this case upon that ground. We do not feel that the substantial rights of the defendant have been affected thereby. What he said did not relate to any fact

material to a proper determination of the case, nor does it suggest the idea of duress. It must appear that prejudice resulted to the defendant from the conduct complained of. We think this record fails to show any prejudice; in fact, negatives the idea of prejudice. What the bailiff said amounted simply to his opinion upon matters not involved in a proper determination of the case. They related only to the duties that were apparent to the jury as well as to the bailiff; "that it was desirable that they should agree upon a verdict; that they could decide this case as well as any other jury"— a fact which we think this jury, like other juries, would have admitted as a fact, without any suggestion from the bailiff. The idea of prejudice is negatived further by the fact that, after all complained of had transpired between the bailiff and the jury, the judge, in the presence of the counsel, came to the jury room and interrogated them as hereinbefore set out, and they answered then that they had not agreed upon a verdict, and did not agree until several hours after that.

Misconduct of a bailiff, unless it is shown to have some prejudicial influence in bringing about results unfavorable, or such as can be reasonably inferred, is not a basis for a new trial.

It is next contended that the court erred in overruling defendant's motion for a continuance. It appears from this record that on the 25th day of November, 1912, the defendant filed a motion requesting that said cause be continued generally until the January term, 1913, or until the 9th day of December, 1912, in which, among other things, they allege, as a basis for the motion, that it desired to take the testimony of one Mrs. Harper, the former wife of plaintiff's assignor, setting out what they expected to prove by her testimony. This motion was sustained and the cause continued until the 19th day of December, 1912. On this day the defendant again appeared and filed a motion for a continuance for the purpose of taking the testimony of Mrs. Harper, setting out again what they

8.  CONTINUANCE:
    absent wit-
    ness: diligence.

expected to prove by her testimony, and further alleging that one Mrs. Kroner was a material witness; that she lived in the city of Chicago, Ill.; that she would testify to all the facts concerning which Mrs. Harper would testify. This motion was overruled, and the defendant complains. Assuming that these witnesses would testify as set out in the affidavits, and assuming that the jury might be led to believe the statements made there as true, incredible, unreasonable, and unnatural as they are, and, if believed to be true, would have carried probative force upon the issues favorable to the defendant, yet we do not feel like reversing the case on this ground. First. We do not feel the record shows the exercise of reasonable diligence to procure this testimony. Second. That it was not filed until the second day of the term when it is apparent that the need of this evidence, if desired at all, was apparent to the plaintiff before that time.

Don Barnes, one of the attorneys for the plaintiff, in resistance to said motion filed the following affidavit. The facts therein set out, if true, were within the knowledge of the court. The court had all the matter before it, and we do not feel justified in interfering with the action of the court in overruling the motion. The affidavit of Don Barnes is as follows:

I, Don Barnes, being first duly sworn on my oath, depose and say that I am one of the attorneys to the above-entitled case actually engaged in the preparation of said case for said trial and that I intend to participate in said trial; that the facts and allegations contained in the objections to the defendant's motion for continuance are true, as I verily believe, and that, at the time this case was previously assigned for trial in November term of this court, I was present in court and made oral and written objections to the continuance of this present cause; that at that time it was stated before the counsel for the plaintiff that they had interviewed Mrs. Harper, the witness referred to in their motion for continuance filed to-day, and that they wished time to take her deposition; that I did at that time, at the presence of the court, offer to consent to take such depositions upon written interrogatories before any

suitable person qualified to take depositions, and that said offer was made in open court, but from that date to this I have not been requested, or none of the counsel for the plaintiff have been requested, to consent to take the deposition of the parties referred to; that we have in our possession certain letters written by the witness Mrs. Harper, which contradict the statements which counsel for the defendant claim she will make. I further depose and say that we have twice prepared this case for trial, and are ready for trial now, and that it will be a hardship on the plaintiff if this case is again continued at the request of the defendant.

Some reference is made by appellant to certain evidence introduced, in which it is claimed that the plaintiff made entirely contradictory statements as to how he was injured, and that the statements made by him were inconsistent with and negative the idea that he received the injuries in the manner claimed by him in his petition.

9. EVIDENCE: conflicting statements: fact question.

We have examined the record on this point, and we find there was a controversy as to what was said, when it was said, the circumstances under which it was said, if said at all, and we consider that, under any view of the case, the matter was for the jury to determine as any other substantive fact. These statements, if proven, only raise a conflict in the evidence as to the manner in which plaintiff received his injuries.

Upon the whole record, we find no reversible error, and the cause is—*Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.